**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO.  15-12510(LSS) |
| SEABOARD HOTEL MEMBER | ) | (Bankr. D. Del.) |
| ASSOCIATES, LLC, *et al.*, | ) | |
|     Debtors. | ) | CHAPTER  11 |
| | ) | |
| | ) | |
| NCA INVESTORS LIQUIDATING | ) | |
| TRUST, | ) | |
|     Plaintiff, | ) | ADV. PRO. NO.  19-5015(JAM) |
| | ) | |
|     v. | ) | |
| | ) | RE: ECF NO.  162 |
| A. PAPPAJOHN CONSTRUCTION | ) | |
| COMPANY, | ) | |
|     Defendant. | ) | |

**APPEARANCES**

Jeffrey M. Sklarz                               *Attorneys for the Plaintiff*
Lawrence S. Grossman
Green & Sklarz LLC
One Audubon Street, 3rd Floor
New Haven, CT 06511

Patrick M. Birney                             *Attorney for the Defendant*
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

**MEMORANDUM OF DECISION AND**
**ORDER GRANTING MOTION TO DISMISS**

Julie A. Manning, Chief United States Bankruptcy Judge

## I.     INTRODUCTION

On December 11, 2017, NCA Investors Liquidating Trust (the "Plaintiff") commenced

this adversary proceeding by filing an eight-count complaint (the "Complaint") in the United

States Bankruptcy Court for the District of Delaware.  The adversary proceeding was transferred to this Court on September 14, 2018.  A. Pappajohn Construction Company (the "Defendant") moved to dismiss the Complaint on October 29, 2018.  The Court held a hearing on the motion to dismiss the Complaint on June 18, 2019.  On July 1, 2019, the Court entered an order dismissing Counts One through Five of the Complaint without prejudice to allow the Plaintiff to file an amended complaint.

The Plaintiff filed a seven-count First Amended Complaint (the "Amended Complaint," ECF No. 158) on September 6, 2019.  Counts One and Three allege intentional fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) and 544(b)(1) and under Conn. Gen. Stat. § 52-552e(a)(1).  Counts Two and Four allege constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B) and 544(b)(1) and under Conn. Gen. Stat. § 52-552e(a)(2).  Count Five alleges preferential transfers under 11 U.S.C. § 547.  Count Six[1] alleges claim disallowance.  Count Seven seeks determination of secured status and avoidance of liens pursuant to 11 U.S.C. § 506(a) and (d).

On November 11, 2019, the Defendant filed a Motion to Dismiss the Amended Complaint with Prejudice, seeking to dismiss Counts One through Four in full and Count Five in part for failure to state a claim upon which relief can be granted (the "Motion to Dismiss," ECF No. 162).  The Motion to Dismiss does not address Counts Six and Seven of the Amended Complaint and therefore this Memorandum of Decision will not address those counts.

---

[1] The Delaware Bankruptcy Court retained jurisdiction over Count Six of the Amended Complaint pursuant to the Order Granting Motion of A. Pappajohn Construction Company for Transfer of Venue to the United States District Court for the District of Connecticut, ECF No. 113.

The Plaintiff filed an opposition to the Motion to Dismiss on January 24, 2020 (the "Opposition," ECF No. 172). On February 14, 2020, the Defendant filed a Reply in Support of the Motion to Dismiss (the "Reply," ECF No. 173). The Court held a hearing on the Motion to Dismiss on June 9, 2020. On October 1, 2020, the Court took the Motion to Dismiss under advisement.

After careful consideration of the Motion to Dismiss, the Opposition, the Reply, the arguments advanced by the parties, and the specific facts and circumstances of this adversary proceeding, for the reasons that follow, the Motion to Dismiss is granted without prejudice to provide the Plaintiff with the opportunity to file an amended complaint.

## II.    **JURISDICTION**

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding pursuant to 28 U.S.C. § 1334(b). The Bankruptcy Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. §§ 157(a) and (b)(1) and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F) and (H).

## III.    **BACKGROUND**

### A. The allegations in the Amended Complaint

Before addressing the facts below, which must be accepted as true when deciding a motion to dismiss, it is important to understand the crux of the Plaintiff's claims in the Amended Complaint. The Plaintiff is attempting to avoid specific alleged actual fraudulent, constructive fraudulent, and preferential transfers made to the Defendant based upon the fact that one of the three co-owners and members of an entity known as Seaboard Hotel Members, LLC, and a number of its related limited liability companies (the "Seaboard Entities"), conducted a massive

3

financial fraud and pled guilty to bank and wire fraud (Amended Complaint at ¶¶ 11, 44). Without alleging any facts surrounding the fraud or the guilty plea, the Plaintiff asserts the fraudulent intent of that co-owner and member, Mr. John J. DiMenna ("DiMenna"), must be imputed to all of the Seaboard entities and to every actual and constructive fraudulent transfer allegedly made by the Seaboard Entities, including the specific transfers made to the Defendant. *See, e.g.*, Amended Complaint at ¶ 94. The Plaintiff further asserts that if that intent is not imputed to the Seaboard entities, the transfers are preferential transfers. Amended Complaint at ¶ 129.

Many of the allegations in the Amended Complaint are broadly made by the Plaintiff, often amounting to bare assertions or legal conclusions. *See, e.g.*, Amended Complaint at ¶¶ 33 through 39. One allegation in the Amended Complaint that attempts to impute DiMenna's intent to the Seaboard Entities asserts that DiMenna caused "…tens of millions of dollars to flow through the Seaboard Consolidated account…," but that allegation is based upon information and belief. *See* Amended Complaint at ¶ 40; *see also* Amended Complaint at ¶ 61. The allegations that follow build on this theme, but do not contain any specific dates, times, locations, or other facts to support these allegations. Before asserting allegations concerning the specific transfers made to the Defendants, the Plaintiff asserts that the collapse of the Seaboard Entities resulted in a loss of more than $70,000,000.00 to creditors and non-insider investors. Amended Complaint at ¶ 45. Despite this allegation, the Plaintiff does not allege in the Amended Complaint if or how the specific transfers to the Defendant were part of that loss.

Furthermore, the Plaintiff fails to specifically allege, as it must pursuant to Fed. R. Civ. P. 8(a) and 9(b) how DiMenna: (i) made or caused each of the transfers to be made to the Defendant with actual intent to hinder, delay, or defraud the creditors of the Seaboard LTS or

4

Tag; (ii) had control over Seaboard LTS and/or Tag at the time each of the transfers were made to the Defendants (*see* Amended Complaint at ¶ 15—"DiMenna, Merritt, and Kelly collectively had the authority to control all the Debtors."); and (iii) made or caused each of the transfers to be made to the Defendant which resulted in Seaboard LTS and/or Tag receiving less than reasonably equivalent value in exchange for the transfers (*see* Amended Complaint at ¶ 46— "Prior to and during 2015, the Defendant provided construction services to [Seaboard LTS]…" for the development of a hotel), and that Seaboard LTS and/or Tag were insolvent when each of the transfers were made.  In addition, the Plaintiff seeks recovery of the transfers made to the Defendant pursuant to 11 U.S.C. § 550, but does not allege anywhere in the Amended Complaint who is the initial transferee, or the immediate or mediate transferee, of each of the transfers made to the Defendant.

It should also be noted that many of the facts asserted in the Amended Complaint are contrary to the positions taken, and ultimately adopted by the Court in the Chapter 11 cases of Seaboard Entities in the United States Bankruptcy Court for the District of Delaware.  For example, the Amended Complaint alleges that Tag transferred $1,000,000.00 to the Defendant using Seaboard LTS as a pass-through.  Amended Complaint at ¶ 93(b).  However, both Tag and Seaboard LTS filed separate Chapter 11 petitions as distinct legal entities, had their own assets and liabilities, and any claims that may have existed between them were deemed compromised and satisfied in the Delaware Bankruptcy Court.  The Plaintiff admits that the Plan, pursuant to which it was formed, was confirmed by the Delaware Bankruptcy Court on May 18, 2017, months before this adversary proceeding was commenced.  Amended Complaint at ¶ 80.  The allegation asserting that Seaboard LTS was used as a pass-through is therefore troubling.

Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud *must state with particularity the circumstances* constituting the fraud.  Fed. R. Civ. P. 9(b) (emphasis added).  Although it is an undisputed fact that DiMenna committed fraud, that fact alone does not establish that every transfer made by one or all of the Seaboard Entities was a fraudulent or preferential transfer.

A review of the alleged facts in the Amended Complaint as set forth below, and the application of the standards governing a motion to dismiss, support granting the Motion to Dismiss.  However, the dismissal will be without prejudice to provide the Defendant with the opportunity to file, if it is possible to do so, an amended complaint.

## B.  Relevant facts[2]

1.      The Plaintiff is a litigation trust established pursuant to the confirmed and effective Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Propco and Holdco Debtors Parties (the "Joint Plan") in the bankruptcy cases of the Seaboard Entities.  Pursuant to the Joint Plan, the Trust is responsible for, among other things, pursuing claims against third parties for the benefit of, *inter alia*, the Seaboard Entities and their respective investors.  Amended Complaint at ¶ 5.

2.      The Seaboard Entities filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware in 2015 and 2016.  Amended Complaint at ¶ 79.  Prior to the

---

[2] The facts set forth in paragraphs 1-44 of this Memorandum of Decision and Order are derived from allegations in the Amended Complaint unless otherwise indicated.  When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept as true all allegations in the complaint that do not amount to legal conclusions or bare assertions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

filing of the Chapter 11 cases, the Seaboard entities each held investments consisting of commercial, hotel, and multi-family residential real estate.  Amended Complaint at ¶ 7.

3.      The Seaboard Entities were controlled by three individuals: John J. DiMenna ("DiMenna"), William A. Merritt ("Merritt"), and Thomas L. Kelly Jr. ("Kelly").  Amended Complaint at ¶ 10.  DiMenna, Merritt, and Kelly controlled the Seaboard Entities through an entity called Seaboard Realty, LLC ("Seaboard Realty"), of which they were co-managing members.  *Id*.

4.      Seaboard Realty effectively was accorded management responsibilities over all of the other Seaboard Entities.  Amended Complaint at ¶ 13.

5.      Seaboard Realty held a 25% equity interest in many of the Seaboard Entities.  Amended Complaint at ¶ 21.  The remaining equity in each Seaboard Entity was held by individual investors.  *Id.*

6.      DiMenna, Merritt, and Kelly collectively had the authority to control all of the Seaboard Entities.  Amended Complaint at ¶ 15.

7.      Each of the Seaboard Entities was created to be a stand-alone company, the profitability of which depended on the performance of the single piece of real estate owned by the entity.  Amended Complaint at ¶ 25.  Investors in the Seaboard Entities did not participate in an investment "portfolio" of multiple real estate properties, but instead made investments in specific real estate projects. *Id.*

8.      When loans were obtained from lenders to support a particular real estate project, and where the lender was given a mortgage on the real property in question, loan documents designated the project-specific purposes for which the loaned funds could be used.  Amended Complaint at ¶ 29.

9.      Investors in the Seaboard Entities understood that the capital raised from them, together with loans from institutional lenders, would be used to acquire, pay debt service on, manage, or make improvements to, the real property in which they invested—and just those properties.  Amended Complaint at ¶ 28.  Therefore, investors could reasonably expect that if a specific Seaboard Entity property in which they invested was financially successful, they would benefit unaffected by the relative success or failure of any of the other Seaboard Entities. Amended Complaint at ¶ 31.

10.      The cash generated by each Seaboard Entity was to remain "siloed" within that entity and was not to be commingled with the assets of other Seaboard Entities.  Amended Complaint at ¶ 32.  If one investment succeeded and another failed, investors in the successful Seaboard Entities would receive distributions, and the investors in the failing Seaboard Entities would not.  *Id*.

11.      Unbeknownst to the investors, however, the investments were not "siloed." Amended Complaint at ¶ 33.  Rather, DiMenna commingled the accounts of the Seaboard Entities in bank accounts maintained by Seaboard Realty.  *Id.*  He also frequently used the accounts of Seaboard Consolidated, LLC ("Seaboard Consolidated"), an entity wholly owned by DiMenna, as a pass-through to facilitate transfers of assets of one entity to another entity. Amended Complaint at ¶¶ 33, 39.  DiMenna later pled guilty to bank and wire fraud.  Amended Complaint at ¶ 44.

12.      Seaboard Hotel LTS Associates ("Seaboard LTS"), one of the Seaboard Entities, owned a parcel of property in Stamford, Connecticut (the "Property") on which it was in the process of developing a long-stay residence hotel, the Residence Inn (the "Hotel Project"). Amended Complaint at ¶ 27(b).

13.      In 2012, Seaboard LTS obtained a $6,000,000.00 construction mortgage with Israel Discount Bank ("IDB") to fund the Hotel Project ("IDB First Mortgage Loan").  Amended Complaint at ¶ 47.  In July 2014, the IBD Loan was increased to $11,000,000.00.  *Id*.  In April 2015, IBD also provided a $7,000,000.00 loan (the "IBD Subordinated Mortgage Loan").  *Id*.  IBD's Loans were secured by mortgages on the real estate owned by Seaboard LTS.  *Id*.

14.      The Defendant provided construction services to Seaboard LTS to build the Hotel Project.  Amended Complaint at ¶ 46.

15.      In February 2014, Seaboard LTS and the Defendant executed a construction contract (the "Contract") for the Hotel Project.  *See* the Contract, attached as Exhibit 1 to the Motion to Dismiss.[3]

16.      Pursuant to the Contract, the Defendant was required, among other things, to submit itemized Applications for Payment to Seaboard LTS's architect, who would, in turn, either issue a Certificate of Payment for amounts properly due or notify the Defendant and Seaboard LTS of the reasons for withholding certification in whole or in part.  *See* Article 9 of the Contract, attached as Exhibit 1 to the Motion to Dismiss.[4]  After the Certificate of Payment was issued, Seaboard LTS would make payment to the Defendant.  *See id.*[5]

---

[3]      When deciding a motion to dismiss, a court may consider documents incorporated by reference in the complaint or "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Documents that are "integral to a plaintiff's claims, even if they are not explicitly incorporated by reference," may properly be considered on a motion to dismiss.  *Donoghue v. Patterson Companies, Inc.*, 990 F. Supp. 2d 421, 423 (S.D.N.Y. 2013) ((citing *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 391 (S.D.N.Y. 2001)).  Although the Contract is not attached to the Amended Complaint, the Hotel Project is explicitly mentioned in the Amended Complaint several times, including with respect to the payments made to the Defendant that the Plaintiff now seeks to avoid.  *See* Amended Complaint at ¶¶ 46, 73.

[4] *See* footnote 3, *supra*.

[5] *See* footnote 3, *supra*.

17.     Although funds drawn from the IDB loans were meant to be used only by Seaboard LTS for construction of the Hotel Project, DiMenna transferred proceeds of the IDB loans from Seaboard LTS to other Seaboard Entities, sometimes effectuating these transfers through Seaboard Consolidated, in order to support their operations or to make distributions to investors.  Amended Complaint at ¶¶ 48, 51.  Funds from the IDB loans were comingled, through Seaboard Consolidated, with funds belonging to other Seaboard Entities.  Amended Complaint at ¶ 51.

18.     In order to fund construction of the Hotel Project, DiMenna diverted funds belonging to other Seaboard Entities, including Tag Forest LLC ("Tag Forest"), and transferred those funds through Seaboard Consolidated to Seaboard LTS.  Amended Complaint at ¶ 50.  Seaboard LTS then used the funds to pay, among other things, the Defendant's construction bills.  *Id.*

19.     While the Hotel Project was ongoing, Seaboard LTS had no legitimate source of funds other than the IDB loans.  Amended Complaint at ¶ 51.

20.     In October 2013, Seaboard Consolidated transferred $106,500.00 to Seaboard LTS.  Amended Complaint at ¶ 107(a).

21.     On October 30, 2013, Seaboard LTS transferred $15,000.00 to the Defendant (the "October 30, 2013 Transfer").  Amended Complaint at ¶ 107(a).

22.     In November 2014, Seaboard Consolidated transferred $231,000.00 to Seaboard LTS and another Seaboard Entity transferred $250.00 to Seaboard LTS.  Amended Complaint at ¶ 107(b).

23.     On November 24, 2014, Seaboard LTS transferred $80,000.00 to the Defendant (the "November 24, 2014 Transfer").  Amended Complaint at ¶ 107(b).

24.     By January 2015, the IDB loans had been nearly exhausted or had been used for purposes other than payment to the Defendant or valid Seaboard LTS expenses. Amended Complaint at ¶ 52. After January 2015, the IDB funding was insufficient to permit Seaboard LTS to complete the Hotel Project. *Id.*

25.     In April 2015, Seaboard LTS received funds in the amount of $1,500,000.00 from Seaboard Consolidated and received $239,742.00 of IDB loan proceeds. Amended Complaint at ¶ 55. In April 2015, Seaboard LTS disbursed $1,500,000.00 to First American Title Insurance Co. *Id.* Seaboard LTS also disbursed $235,000.00 to Seaboard Consolidated. *Id.* Other than the $239,742.00 of IDB loan proceeds, none of the funds transferred to Seaboard LTS from Seaboard Consolidated, or disbursed by Seaboard LTS, were the property of Seaboard LTS. [6] Amended Complaint at ¶ 56.

26.     In July 2015, Seaboard LTS received funds in the amount of $126,950.00 from Seaboard Consolidated. Amended Complaint at ¶ 60. In July 2015, Seaboard LTS disbursed $127,233.19. *Id.* None of the funds transferred to Seaboard Hotel LTS from Seaboard Consolidated or disbursed by Seaboard LTS were Seaboard LTS's money.[7] Amended Complaint at ¶ 61.

27.     In August 2015, Seaboard LTS received funds in the amount of $74,000.00 from Seaboard Consolidated and $684,823.50 of IDB loan proceeds, which constituted the remaining funds available on the IDB loans. Amended Complaint at ¶ 62. In August 2015, Seaboard LTS disbursed $73,668.89. *Id.*

28.     The IDB loans matured on August 31, 2015. Amended Complaint at ¶ 59.

---

[6] The Amended Complaint uses the terms "disbursed," "transferred," and "received" interchangeably. It is not clear how, if at all, those terms are distinct.
[7] *See* footnote 6, *supra*.

29.     In September 2015, Seaboard LTS received the following funds:

a.  A deposit in the amount of $52,858.98[8];

b.  Funds in the amount of $431,000.00 from Seaboard Consolidated;

c.  Funds in the amount of $32,000.00 from account x1797;

d.  Funds in the amount of $126,950.00 from Seaboard Consolidated.

Amended Complaint at ¶ 64.

30.     In September 2015, Seaboard LTS disbursed $256,750.00 to Seaboard Consolidated.[9]  Amended Complaint at ¶ 65.

31.     On September 4, 2015, Seaboard LTS used funds obtained from the IDB loans to transfer $692,135.48 to the Defendant (the "September 4, 2015 Transfer").  Amended Complaint at ¶¶ 65, 93.

32.     In October 2015, Seaboard LTS received funds in the amount of $31,000.00 from account x1797 and funds in the amount of $3,000.00 from Seaboard Consolidated.  Amended Complaint at ¶ 68.  In October 2015, Seaboard LTS disbursed $37,285.40.[10]  *Id.*

33.     A Seaboard LTS TD Bank account statement for the time period of November 2015 showed a balance of $909.05 as of November 1, 2015.  Amended Complaint at ¶ 70.

34.     On November 2, 2015, Tag Forest, LLC ("Tag") received a transfer of $1,500,000.00 from a purchaser of real estate owned by Tag.  Amended Complaint at ¶ 71.  On November 2, 2015, Tag transferred $1,100,000.00 to Seaboard LTS.   Amended Complaint at ¶ 72.  Almost immediately thereafter, also on November 2, 2015, Seaboard LTS transferred

---

[8] The Amended Complaint does not allege the source of the deposit.
[9] *See* footnote 6, *supra.*
[10] *See* footnote 6, *supra.*

$1,084,136.75 to the Defendant to pay for construction services rendered in the construction of the Hotel Project (the "November 2, 2015 Transfer").  Amended Complaint at ¶ 73.

35.    During November 2015, Seaboard LTS received funds in the amount of $330,000.00 from Seaboard Consolidated.  Amended Complaint at ¶ 93(d).

36.    On November 18, 2015, Seaboard LTS transferred $60,000.00 to the Defendant (the "November 18, 2015 Transfer").  Amended Complaint at ¶ 93(d).

37.    On November 20, 2015, Seaboard LTS transferred $9,145.00 to the Defendant (the "November 20, 2015 Transfer").  Amended Complaint at ¶ 93(d).

38.    Each of the Seaboard Entities filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware between December 13, 2015 and March 17, 2016.[11]  Amended Complaint at ¶ 79.  The Debtors' cases are jointly administered.  *Id.*

39.    On January 11, 2016, the Defendant recorded a Certificate of Mechanic's Lien against the Property in the amount of $5,249,493.43 for construction goods and services provided by the Defendant pursuant to the Contract.  *See* Claim 243, attached as Exhibit 2 to the Motion to Dismiss.[12]

---

[11] Seaboard LTS's petition date was February 3, 2016 and Tag Forest's petition date was December 14, 2015.

[12] A court can take judicial notice of documents and pleadings filed in judicial proceedings when ruling on a motion to dismiss.  *See In re Allou Distributors*, 387 B.R. 365, 384 (Bankr. E.D.N.Y. 2008) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).  "Judicial notice of public records is appropriate—and does not convert a motion to dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned."  *See Bentley v. Dennison*, 852 F. Supp. 2d 379, 382, at n. 5 (S.D.N.Y. 2012), *aff'd sub nom. Betances v. Fischer*, 519 F. App'x 39 (2d Cir. 2013) (citing Federal Rule of Evidence 201(b)).

40.     On October 19, 2016, the Defendant filed a secured Proof of Claim, Claim 243, in the amount of $5,316,578.64 for amounts due and owing under the Contract.  *See* Claim 243, attached as Exhibit 2 to the Motion to Dismiss.[13]

41.     On April 5, 2017, the Delaware Bankruptcy Court entered an order approving the sale of the Property in the amount of $19,007,548.64 to the designated assignee of IDB. Amended Complaint at ¶ 88.

42.     On May 18, 2017, the Delaware Bankruptcy Court confirmed the Joint Plan. Amended Complaint at ¶ 80.

43.     The Joint Plan did not substantively consolidate the bankruptcy estates of the Seaboard Entities.  *See generally* the Joint Plan, attached as Exhibit 3 to the Motion to Dismiss.[14]

44.     The Joint Plan provided that, after the effective date of the Joint Plan, "all Intercompany Claims shall be deemed compromised and satisfied."  *See* the Joint Plan at pg. 3-168-69.[15]

## IV.     DISCUSSION

### A.     Standards Governing the Motion

Rule 12(b)(6) of the Federal Rules of Civil Procedure is made applicable in adversary proceedings through Federal Rule of Bankruptcy Procedure 7012(b).  *See* Fed. R. Bankr. P. 7012(b).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a pleading must contain a short, plain statement of the claim showing the pleader is entitled to relief, *see* Fed. R. Civ. P. 8(a)(2), and a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

---

[13] *See* footnote 12, *supra*.
[14] *See* footnote 12, *supra*.
[15] *See* footnote 12, *supra*.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007)).  A pleading cannot merely recite the elements of a cause of action or "tender[] naked assertion[s] devoid of further factual enhancement."  *Id.*

In *Iqbal*, the United States Supreme Court provided a two-step analysis to evaluate the sufficiency of a complaint in the context of a motion to dismiss.  First, all allegations in the complaint, except legal conclusions or "naked assertions," must be accepted as true; second, the complaint must state a plausible claim for relief.  *Id.* at 678-79.  *See also Carpenters Pension Tr. Fund of St. Louis v. Barclays, PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  Determining the plausibility of a claim for relief is context-specific and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Furthermore, Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be plead with particularity.  *See In re Sharp Int. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005); *Allou Distributors*, 387 B.R. at 384-85 (citing Fed. R. Civ. P. 9(b)).  To satisfy the heightened pleading requirements of Rule 9(b), "a complaint must allege with some specificity the acts constituting fraud ... [and] conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (citation omitted).  "While Rule 9(b) provides that intent may be averred generally, plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Allou Distributors*, 387 B.R. at 385 (internal quotation marks omitted) (citation omitted).  The "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Because fraudulent intent "is rarely susceptible to direct proof… courts have developed 'badges of fraud' to establish the requisite actual intent to defraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (citation omitted).  The badges of fraud – the circumstances from which courts have inferred an intent to defraud – include "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *In re Operations NY LLC*, 490 B.R. 84, 94-95 (Bankr. S.D.N.Y. 2013).  The particularity requirement of Rule 9(b) "applies only if actual, as opposed to constructive, fraud is alleged." *Allou Distributors*, 387 B.R. at 385.  When courts examine allegations of actual fraud pled by a bankruptcy trustee e, courts take a "more liberal view" since "a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *See In re Marketxt Holdings Corp.*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007).

**B.**  **Counts One and Three of the Amended Complaint: Intentional Fraudulent Transfers**

**1.**  **The Allegations in Counts One and Three**

In Count One of the Amended Complaint, the Plaintiff seeks to avoid the September 4, 2015 Transfer, the November 2, 2015 Transfer, the November 18, 2015 Transfer, and the November 20, 2015 Transfer as intentional fraudulent transfers made within two years of the

petition date under section 548(a)(1)(A).   Specifically, Count One alleges that *Seaboard LTS and/or Tag* made intentional fraudulent transfers to the Defendant in the amount of no less than $1,845,417.23, comprised of: (a) a transfer on September 4, 2015, by Seaboard LTS to the Defendant in the amount of $682,135.28 of funds obtained from the IDB Loans; (b) a transfer on November 2, 2015, by Tag using Seaboard LTS as a pass-through, and Seaboard LTS using nearly all of the Tag funds in making a wire transfer of $1,084,136.75 to the Defendant; (c) a transfer on November 18, 2015 from Seaboard LTS to the Defendant in the amount of $60,000.00; and (d) a transfer on November 20, 2015, from Seaboard LTS to the Defendant in the amount of $9,145.00  Amended Complaint at  ¶ 93(a), (b), and (d).

In Count Three of the Amended Complaint, in addition to the four 2015 transfers listed above, the Plaintiff also seeks to avoid the October 30, 2013 Transfer and the November 24, 2014 Transfer as intentional fraudulent transfers made within four years of the petition date under section 544(b)(1).  Specifically, Count Three alleges that *Seaboard LTS and/or Tag* made intentional fraudulent transfers to the Defendant in the amount of no less than $1,940,417.23, comprised of: (a) the September 4, 2015 Transfer, the November 2, 2015 Transfer, the November 18, 2015 Transfer, and the November 20, 2015 Transfer as set forth above; (b) a transfer on October 30, 2013 from Seaboard LTS to the Defendant in the amount of $15,000.00; and (c) a transfer on November 24, 2014 to the Defendant in the amount of $80,000.00.

**2.  Analysis**

To state a plausible claim for an intentional fraudulent transfer under section 548(a)(1)(A), a plaintiff must allege (1) an interest in the debtor's property was transferred; (2) the transfer was made within two years before the petition was filed; and (3) the transfer was made with actual intent to hinder, delay, or defraud creditors.  *See In re Michel*, 573 B.R. 46, 66

(Bankr. E.D.N.Y. 2017).  Furthermore, the fraud alleged must relate to a specific transfer or payment and not to the overall course of business.  *Sharp*, 403 F.3d at 56.

Section 544(b)(1) provides for relief under applicable state law, which in this case is the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. § 52-552a *et seq.*, ("CUFTA"). A claim for an intentional fraudulent transfer under CUFTA "is not materially distinct from 11 U.S.C. § 548, except for: (1) the extended four-year timeframe prescribed under Conn. Gen. Stat. § 52-552j; (2) the standing requirements as an actual pre-transfer creditor; and (3) the elements of Conn. Gen. Stat. § 52-552e must be proven by clear and convincing evidence." *In re LXEng LLC*, 607 B.R. 67, 88 (Bankr. D. Conn. 2019).

Actual fraudulent transfer claims brought under either section 548(a)(1)(A) or under CUFTA must meet the heightened pleading standard of Rule 9(b).  *See In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011).   Counts One and Three of the Amended Complaint fail to state a claim upon which relief can be granted because they do not, as they must, allege fraud with the particularity Rule 9(b) requires.  Although the allegations in Counts One and Three are accepted as true and are viewed in the light most favorable to the Plaintiff, the allegations do not contain facts sufficient to state a claim for intentional fraudulent transfers under either the Bankruptcy Code or CUFTA.

### i.   *The September 4, 2015 Transfer*

The Plaintiff alleges in paragraph 93(a) of the Amended Complaint that on September 4, 2015, Seaboard LTS used funds obtained from the IDB Loans to transfer $682,135.28 to the Defendant.  The allegations in paragraph 93(a) of the Amended Complaint fail to state a claim upon which relief can be granted because there are no allegations in paragraph 93(a), or in any of the allegations in Count One or in the Amended Complaint, that the September 4, 2015 transfer

was made with the actual intent to hinder, delay, or defraud any entity to which Seaboard LTS was or became indebted.  The only allegation in Count One that asserts fraudulent intent appears in paragraph 94, which applies only to the November 2, 2015 transfer alleged in paragraph 93(b), not the September 4, 2015 transfer.  In addition, the allegations in paragraphs 46 and 47 of the Amended Complaint establish that the Defendant was retained by Seaboard LTS to build the Hotel Project, IDB loaned $18,000,000.00 to Seaboard LTS to construct the Hotel Project, and IDB's loans were secured by mortgages on the real estate owned by Seaboard LTS.  Therefore, the allegations in paragraph 93(a) do not plausibly state a claim for intentional fraudulent transfers and are contrary to the allegations throughout the Amended Complaint which admit that the Defendant provided services to Seaboard LTS to construct the Hotel Project.

### ii.  The November 2, 2015 Transfer

The Plaintiff next alleges in paragraph 93(b) that Tag transferred $1,100,000.00 to the Defendant using Seaboard LTS as a "pass-through," and that Seaboard LTS used nearly all of the Tag funds when it made the wire transfer of $1,084,136.75 to the Defendant.  Although new, this allegation does not plead with specificity how Tag made such transfer with actual intent to hinder, delay, or defraud any entity to which Tag was or become indebted.  The Plaintiff attempts to allege actual fraud in paragraph 94 by concluding that DiMenna's fraudulent intent must be imputed to each of the "transferring Debtors" because DiMenna was in a position to control the property of the companies at the time of the transfers.  However, the allegations about DiMenna and his activities that appear in paragraphs 33 through 45 of the Amended Complaint do not allege any facts specific to the November 2, 2015 transfer and do not establish as alleged in paragraph 94 that DiMenna "was in a position to control the property of the companies at the time of the transfers."  Furthermore, several of the allegations in paragraphs 33 through 45 are

based on "information and belief," describe activities without any specific references to dates, and assert legal conclusions as opposed to pleading specific facts to support an intentional fraudulent transfer claim.  Although DiMenna pled guilty to bank and wire fraud as alleged in paragraph 44, there are no allegations anywhere in the Amended Complaint that he, Seaboard LTS, or Tag possessed actual fraudulent intent when the November 2, 2015 Transfer was made to the Defendant.

The Amended Complaint fails to sufficiently allege DiMenna had dominion or control over Tag or Seaboard LTS such that any actual fraudulent intent of DiMenna could be imputed to those entities.  In fact, paragraph 10 of the Amended Complaint alleges that the Seaboard Entities were controlled by DiMenna, Merritt, and Kelly as co-managing members, and paragraph 15 of the Amended Complaint asserts that DiMenna, Merritt, and Kelly – through Seaboard Realty – collectively had the authority to control all of the Seaboard Entities.  While paragraph 94 of the Amended Complaint asserts that DiMenna was in a position to control the property of the Debtors at the time of the alleged intentional fraudulent transfers, a mere assertion, without further factual enhancement, is insufficient to establish a strong inference of fraudulent intent that can be imputed to Seaboard LTS or to Tag.  *See Iqbal*, 556 U.S. at 678 (explaining that a complaint which merely recites the elements of a cause of action or "tenders naked assertions devoid of further factual enhancement" does not suffice) (internal quotation marks and citation omitted).

Although the Plaintiff argues that the Ponzi scheme presumption should be applied to establish actual fraudulent intent, this argument is not persuasive.  A Ponzi scheme occurs when "money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme."

*In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 8 (S.D.N.Y. 2007).  "There is a general rule – known as the 'Ponzi scheme presumption' – that such a scheme demonstrates 'actual intent' as matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."  *Id.*

The Plaintiff has not alleged any facts to plausibly establish that DiMenna's conduct amounted to a Ponzi scheme.  While paragraph 44 of the Amended Complaint states that DiMenna improperly comingled accounts of the Seaboard Entities and later pled guilty to bank and wire fraud, the Amended Complaint neither asserts a Ponzi scheme existed nor alleges facts to support the existence of a Ponzi scheme.  Further, in order for the Ponzi scheme presumption to apply, the transfers sought to be avoided must have been made in furtherance of the Ponzi scheme.  The transfers made to the Defendant cannot be found to have been made in furtherance of a Ponzi scheme when there are numerous allegations in the Amended Complaint that Seaboard LTS was in the process of developing the Hotel Project and that the payments made to the Defendant were in satisfaction of actual services the Defendant provided constructing the Hotel Project.

In addition, in order for the Plaintiff to prevail on the claim that the November 2, 2015 transfer was an intentional fraudulent transfer, the Plaintiff must rely on a position that is clearly inconsistent with the prior positions of Seaboard LTS and Tag in their bankruptcy cases, which the Plaintiff is judicially estopped from doing.  Judicial estoppel involves a "potential consequence of a conflict between two factual statements made by the same party."  *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).  Thus, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the

prejudice of the party who has acquiesced in the position formerly taken by him." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).   Judicial estoppel will apply if "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Id.*

Here, when each of their Chapter 11 cases were filed, Seaboard and Tag both affirmed that they were distinct and separate legal entities.   Both Seaboard LTS and Tag also previously affirmed they each owned specific parcels of real property exclusive to that entity.   Furthermore, both Seaboard LTS and Tag previously affirmed that each had its own assets, liabilities, creditors, and investors.   The Delaware Bankruptcy Court adopted the prior positions of Seaboard LTS and Tag when it entered the Order confirming the Joint Plan—a joint plan that was proposed and signed by, among others, Seaboard LTS and Tag.   The Plaintiff is bound by the prior positions of Seaboard LTS and Tag, the provisions Joint Plan, and the provisions of the Order confirming the Joint Plan.   By way of example, Section 5.8 of the Joint Plan provides that "[a]ll Intercompany Claims shall be deemed compromised and satisfied as a result of the intercompany settlements and allocations of Cash among the Plan Debtors effectuated under the Plan and, after the Effective Date, all Intercompany Claims shall be deemed compromised and satisfied and there shall be no Distributions on account of Intercompany Claims except as expressly provided for in the Plan."   *See* ECF No. 1805-1 in Case No. 15-12507 (Bankr. D. Del.).   The Joint Plan defines an Intercompany Claim as "any Claim of whatever nature arising at whatever time, held by one Plan Debtor against another Plan Debtor."   *See id.*   Both Seaboard LTS and Tag are Plan Debtors as defined in the Joint Plan.   *See id.*   Furthermore, and

significantly, the Joint Plan did not substantively consolidate the bankruptcy estates of the Plan Debtors. *See id.*

The Plaintiff's new allegations regarding the November 2, 2015 Transfer as being from Tag to the Defendant with Seaboard LTS has a pass-through are "clearly inconsistent" with the prior position of Seaboard LTS and Tag in their Chapter 11 case, the provisions of the Joint Plan, and the provisions of the Order confirming the Joint Plan.  To allow the Plaintiff to assert these inconsistent positions would enable the Plaintiff to have an unfair advantage against the Defendant in this adversary proceeding.  For these reasons, the Plaintiff is judicially estopped from claiming that Seaboard LTS acted as a "pass-through" of the November 2, 2015 Transfer in order to sufficiently allege actual fraudulent intent.

### iii.   The November 18 and 20, 2015 Transfers

The allegations in paragraph 93(d) of the Amended Complaint fail to state a claim upon which relief can be granted because there are no allegations in paragraph 93(d), or in any of the allegations in Count One or in the Amended Complaint, that the November 18 and 20, 2015 transfers were made with the actual intent to hinder, delay, or defraud any entity to which any of the Seaboard Entities or Seaboard LTS was or became indebted.  As is true of the allegation in paragraph 93(a), the only allegation in Court One that asserts fraudulent intent appears in paragraph 94, which applies only to the November 2, 2015 Transfer alleged in paragraph 93(b), and not to the November 18 and 20, 2015 Transfers.  There are also no specific allegations identifying which of the Seaboard Entities had an interest in the property that was transferred to the Defendant.  In addition, the allegations in paragraphs 46 and 47 Amended Complaint establish that the Defendant was retained by Seaboard LTS to build the Hotel Project, IDB loaned over $18,000,000.00 to Seaboard LTS to construct the Hotel Project, and IBD's Loans

were secured by mortgages on the real estate owned by Seaboard LTS.  Therefore, the

allegations in paragraph 93(d) do not plausibly state a claim for intentional fraudulent transfers

and are contrary to the allegations throughout the Amended Complaint which admit that the

Defendant provided services to Seaboard LTS to construct the Hotel Project.

### iv.   The October 30, 2013 and the November 24, 2014 Transfers

The allegations in paragraphs 107(a) and (b) of the Amended Complaint fail to state a

claim upon which relief can be granted because there are no allegations in paragraph 107, or

elsewhere in the Amended Complaint, that the October 30, 2013 and the November 24, 2014

Transfers were made with the intent to hinder, delay, or defraud and entity to which any of the

Seaboard entities or Seaboard LTS was or became indebted.  The only allegation in Count Three

that asserts actual fraudulent intent appear in paragraph 110, which state only that the transfers

were made "by the Debtors whose funds were used to pay the Defendant with the actual intent to

hinder, delay, or defraud the Plan Debtors' creditors."  As is true in Count One of the Amended

Complaint, the allegations relating to actual fraudulent intent are general, conclusory, and devoid

of specific allegations identifying which Seaboard Entity's funds were used to pay the

Defendant, and which Plan Debtors' creditors were hindered, delayed, or defrauded by such

transfers.   Further, allegations in paragraphs 107(a) and (b) are contrary to the allegations

throughout the Amended Complaint establishing that the Defendant provided construction

services to Seaboard LTS to build the Hotel Project.  Accordingly, the allegations in paragraphs

107(a) and (b) fail to state a claim for intentional fraudulent transfers.

### v.   The Amended Complaint does not sufficiently allege badges of fraud

Finally, in addition to the reasons set forth above, the Amended Complaint fails to state a

claim upon which relief can be granted because it does not sufficiently allege actual fraudulent

and does not plead any circumstances that give rise to the inference of fraudulent intent with respect to the transfers sought to be avoided. Rather, the Amended Complaint establishes that the transfers were made to the Defendant as part of a legitimate business transaction. The Amended Complaint alleges facts including: (i) that Seaboard LTS legitimately borrowed $18,000,000.00 from IDB to be used for funding the Hotel Project; (ii) the Defendant provided the construction services; (iii) Seaboard LTS made payments to the Defendant for construction services rendered; (iv) the Delaware Bankruptcy Court approved a sale process related to the Hotel Project; and (v) the sale process culminated in a the Delaware Bankruptcy Court authorizing the sale of the Hotel Project for an amount in excess of $19,000,000.00.

These facts establish that the payments Seaboard LTS made to the Defendant were made in exchange for work the Defendant performed constructing the Hotel Project. Further, the allegations in the Amended Complaint regarding the court-approved sale of the Hotel Project establish that Seaboard LTS's bankruptcy estate benefitted from the Defendant's construction work by a reduction in its bankruptcy liabilities equal to the sale price.

The circumstances surrounding the payments made to the Defendant, who dealt with Seaboard LTS at arm's length, do not give rise to an inference of fraudulent intent. Because the Amended Complaint contains no allegations of fraud or a fraudulent scheme with respect to the loans from IDB, with respect to the Hotel Project, or with respect to the work the Defendant performed on the Hotel Project, the Plaintiff fails to state a claim for intentional fraudulent transfers.

For the reasons set forth above, the Motion to Dismiss is granted as to Counts One and Three of the Amended Complaint.

**C.** **Counts Two and Four of the Amended Complaint: Constructive Fraudulent Transfers**

**1.  The Allegations in Counts Two and Four**

In Count Two, the Plaintiff seeks to avoid the September 4, 2015 Transfer, the November 2, 2015 Transfer, the November 18, 2015 Transfer, and the November 20, 2015 Transfer as constructive fraudulent transfers made within two years of the petition date under section 548(a)(1)(B).  Specifically, Count Two, which incorporates paragraphs 1-98 of the Amended Complaint, alleges that *Seaboard LTS and/or Tag* made constructive fraudulent transfers to the Defendant in the amount of no less than $1,845,417.23, comprised of: (a) a transfer on September 4, 2015, by Seaboard LTS to the Defendant in the amount of $682,135.28 of funds obtained from the IDB Loans; (b) a transfer on November 2, 2015, by Tag using Seaboard LTS as a pass-through, and Seaboard LTS using nearly all of the Tag funds in making a wire transfer of $1,084,136.75 to the Defendant; (c) a transfer on November 18, 2015 from Seaboard LTS to the Defendant in the amount of $60,000.00; and (d) a transfer on November 20, 2015, from Seaboard LTS to the Defendant in the amount of $9,145.00.  Amended Complaint at ¶ 99.

In Count Four, in addition to the four 2015 transfers listed above, the Plaintiff also seeks to avoid the October 30, 2013 Transfer and the November 24, 2014 Transfer as constructive fraudulent transfers made within four years of the petition date under section 544(b)(1).  Specifically, Count Four, which incorporates paragraphs 1-113 of the Amended Complaint, alleges that *Seaboard LTS and/or Tag* made constructive fraudulent transfers to the Defendant in the amount of no less than $1,940,417.23, comprised of: (a) the September 4, 2015 Transfer, the November 2, 2015 Transfer, the November 18, 2015 Transfer, and the November 20, 2015 Transfer as set forth above; (b) a transfer on October 30, 2013 from Seaboard LTS to the

26

Defendant in the amount of $15,000.00; and (c) a transfer on November 24, 2014 to the

Defendant in the amount of $80,000.00.

### 2. Analysis

To state a plausible claim for a constructive fraudulent transfer under section

548(a)(1)(B), a plaintiff must allege (1) an interest of the debtor's in property was transferred; (2)

the transfer was made within two years before the petition was filed; (3) the debtor received less

than a reasonably equivalent value in exchange for the transfer; and (4) that the debtor was

insolvent on the date that such transfer was made or became insolvent as a result of the transfer.

*See In re Michel*, 573 B.R. at 57.

Section 544(b)(1) provides for relief under applicable state law, which in this case is

CUFTA.  Pursuant to CUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent

as to a creditor whose claim arose before the transfer was made or the obligation was incurred if

the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent

value in exchange for the transfer or obligation and the debtor was insolvent at that time or the

debtor became insolvent as a result of the transfer or obligation."  Conn. Gen. Stat. § 52-552f(a).

In order to allege a constructive fraudulent transfer claim under section 544 or under

CUFTA, the Plaintiff must plead facts to plausibly establish "(1) that the [d]ebtor received less

than a reasonably equivalent value in exchange for the transferred property, and (2) that the

debtor was insolvent when the transfer was made."  *See In re Neri Bros. Constr. Corp.*, 593 B.R.

100, 143 (Bankr. D. Conn. 2018) (noting that "substantial consideration pursuant to § 52-

552e(a)(2) and reasonably equivalent value are virtually identical.").  Under both the Bankruptcy

Code and CUFTA, value is defined as, among other things, the satisfaction of an antecedent

debt.  *See* 11 U.S.C. § 548(d)(2)(A); Conn. Gen. Stat. § 52-552d.  A constructive fraudulent

transfer claim does not need to meet the heightened pleading standard of Rule 9(b).  *See Allou Distributors*, 387 B.R. at 404.

### i.    *The September 4, 2015 Transfer*

The allegations in paragraph 99-105 of the Amended Complaint fail to state a claim upon which relief can be granted because there are no allegations in paragraphs 99-105, or in any of the allegations in Count Two or in the Amended Complaint, that the September 4, 2015 Transfer was made by an entity who received less than reasonably equivalent value.  Rather, in paragraph 93(a) of the Amended Complaint, the Plaintiff assert that the September 4, 2015 Transfer was made by Seaboard LTS to the Defendant with finds obtained from the IDB loans.  In addition, the allegations in paragraphs 46 and 47 Amended Complaint establish that the Defendant was retained by Seaboard LTS to build the Hotel Project, IDB loaned over $18,000,000.00 to Seaboard LTS to construct the Hotel Project, and IBD's Loans were secured by mortgages on the real estate owned by Seaboard LTS.  Further, the allegations in paragraph 88 of the Amended Complaint establish that the Delaware Bankruptcy Court approved the sale of the Hotel Project to the assignee of IDB in the amount of $19,007,548.64.  Therefore, the allegations in paragraphs 99-103 of the Amended Complaint do not plausibly state a claim for constrictive fraudulent transfers and are contrary to the allegations throughout the Amended Complaint which admit that Seaboard LTS received reasonably equivalent value.  *See In re Geltzer*, 502 B.R. 760, 771 (Bankr. S.D.N.Y. 2013) (explaining that "one of the essential elements of a constructive conveyance" under section 548(a)(1)(B) is that the debtor did not receive reasonably equivalent value and when a complaint does not allege such, the claim should be dismissed.).

*ii.*    *The November 2, 2015 Transfer*

The Plaintiff next alleges that Tag transferred $1,100,000.00 to the Defendant using

Seaboard LTS as a "pass-through," and that Seaboard LTS used nearly all of the Tag funds when

it made the wire transfer of $1,084,136.75 to the Defendant.  The Plaintiff argues that the

November 2, 2015 Transfer to the Defendant was comprised of funds belonging to *Tag* and that

*Tag* did not receive reasonably equivalent value in exchange for the transfer.  This allegation is

premised on Seaboard LTS being a mere "pass-though."  As discussed above, the Plaintiff is

judicially estopped from claiming that Seaboard LTS acted as a "pass-through."  Because the

Joint Plan satisfied all intercompany transfers, the Plaintiff cannot now claim that Seaboard LTS

acted as a mere "pass-through" of funds from Tag to the Defendant in order to allege a

constructive fraudulent transfer claim.

The Plaintiff also argues that the Court should view the entire series of transactions that

ultimately led to the November 2, 2015 Transfer from Seaboard LTS to the Defendant as one,

integrated transaction originating with the transfer from Tag that resulted in Seaboard LTS

holding funds to transfer to the Defendant.  The Plaintiff contends that interrelated but distinct

steps in a transaction should not be considered independently of the overall transaction, and cites

to *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 379 (Bankr. S.D.N.Y. 2013) in support

of this proposition.  The facts of *Wedgewood*, however, are readily distinguishable.  In

*Wedgewood*, the Court collapsed two sales agreements and treated them as one integrated

transaction upon finding that it was "clear that the parties intended an integrated transaction,"

that the effect of the two sales agreements was that the buyer purchased substantially all of the

debtor's assets, and that the assets under both agreements were "sold for one purchase price

delivered in a single wire transfer." *Id.* at 380.  The facts and circumstances in *Wedgewood* are

not analogous to the situation here and do not support the claim that the transfers should be viewed as being from Tag to the Defendant.

### iii.   The November 18 and 20, 2015 Transfers

The allegations in paragraphs 99-105 of the Amended Complaint fail to state a claim upon which relief can be granted because there are no allegations in paragraphs 99-105 or in the Amended Complaint that Seaboard LTS did not receive reasonably equivalent value in exchange for the November 18 and 20, 2015 Transfers.  As discussed above, the allegations in paragraphs 46 and 47 Amended Complaint establish that the Defendant was retained by Seaboard LTS to build the Hotel Project, and the allegations in paragraph 88 of the Amended Complaint establish that the Delaware Bankruptcy Court approved the sale of the Hotel Project to the assignee of IDB in the amount of $19,007,548.64.  Therefore, the allegations in paragraphs 99-103 of the Amended Complaint do not plausibly state a claim for constrictive fraudulent transfers and are contrary to the allegations throughout the Amended Complaint which admit that Seaboard LTS received reasonably equivalent value.  Because the Plaintiff has not sufficiently alleged that Seaboard LTS did not receive reasonably equivalent value in exchange for the November 18 and 20, 2015 Transfers, it has failed to state a constructive fraudulent transfer claim upon which relief can be granted.  *See Geltzer*, 502 B.R. at 771.

The Plaintiff attempts to allege constructive fraudulent transfers in paragraph 100 of the Amended Complaint by stating that "[t]he respective Debtors whose funds were used to pay the Defendant, received less than a reasonably equivalent value" in exchange for the transfers.  As explained above with respect to the November 2, 2015 Transfer, however, there is no basis for this Court to view a series of transaction among the Seaboard Entities that ultimately led to the November 18 and 20, 2015 Transfers from Seaboard LTS to the Defendant as integrated

transactions originating with the transfer from a Seaboard Entity that resulted in Seaboard LTS holding funds to transfer to the Defendant.

### iv.    The October 30, 2013 and the November 24, 2014 Transfers

The allegations in paragraphs 114-121 of the Amended Complaint fail to state a claim upon which relief can be granted because there are no allegations in these paragraphs, or elsewhere in the Amended Complaint, that Seaboard LTS did not receive reasonably equivalent value in exchange for the October 30, 2013 and the November 24, 2014 Transfers.  The allegations in paragraphs 114-121 are contrary to the allegations throughout the Amended Complaint establishing that the Defendant provided construction services to Seaboard LTS to build the Hotel Project, and that the Hotel Project was ultimately sold for more than $19,000,000.00.  Because the Plaintiff has not sufficiently alleged that Seaboard LTS did not receive reasonably equivalent value in exchange for the October 30, 2013 and the November 24, 2014 Transfers, it has failed to state a constructive fraudulent transfer claim upon which relief can be granted. *See Geltzer*, 502 B.R. at 771.

The Plaintiff again attempts to allege constructive fraudulent transfers in paragraph 115 of the Amended Complaint by stating that "[t]he respective Debtors whose funds were used to pay the Defendant, received less than a reasonably equivalent value" in exchange for the transfers.  As explained above with respect to the November 2, 2015 Transfer and the November 18 and 20, 2015 Transfers, there is no basis for this Court to view a series of transaction among the Seaboard Entities that ultimately led to the October 30, 2013 and the November 24, 2014 Transfers from Seaboard LTS to the Defendant as integrated transactions originating with the transfer from a Seaboard Entity that resulted in Seaboard LTS holding funds to transfer to the Defendant.

For the reasons set forth above, the Motion to Dismiss is granted as to Counts Two and Four of the Amended Complaint.

### 3.   Count Five of the Amended Complaint: Preferential Transfers

In Count Five, the Plaintiff seeks to avoid the November 2, 2015 Transfer, the November 18, 2015 Transfer, and the November 20, 2015 Transfer as preferential transfers made within 90 days of the petition date under section 547.  The Defendant has moved to dismiss Count Five only with respect to the November 2, 2015 Transfer.

To state a plausible claim for a preferential transfer under section 547(b), a plaintiff must allege a transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—

(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title....

*In re Bruno Mach. Corp.*, 435 B.R. 819, 836-37 (Bankr. N.D.N.Y. 2010).  Courts have held that in order to survive a motion to dismiss, a complaint to avoid preferential transfers must allege: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date [of the transfer], (ii) name of the debtor/transferor, (iii) name of the transferee and (iv) the amount of the transfer." *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 462 (Bankr. D. Del. 2018) (internal quotation marks omitted).

The Court has carefully reviewed the allegations in the Amended Complaint and the reasonable inferences that they support in the light most favorable to the Plaintiff.  Even when viewed in this light, however, the Plaintiff has not alleged facts sufficient to state a claim for a preferential transfer with respect to the November 2, 2015 Transfer.

The transfers the Plaintiff seeks to avoid as preference actions were made from Seaboard LTS to the Defendant.  Seaboard LTS's petition date was February 3, 2016.  Therefore, only transfers that occurred during the 90 days prior to February 3, 2016 – between November 4, 2015 and February 2, 2016 – are subject to avoidance as preferential transfers.  Because the November 2, 2015 Transfer occurred more than 90 days prior to the petition date, the Plaintiff has failed to state a claim upon which relief can be granted regarding that transfer.

The Plaintiff argues that the November 2, 2015 transfer should be integrated such that it was a transfer from Tag to the Defendant, with Seaboard LTS acting as a mere conduit.  If the November 2, 2015 Transfer is viewed as coming from Tag, the Plaintiff argues, then the November 2, 2015 Transfer occurred within the 90 days before Tag's petition date, December 14, 2015.  The Court has already determined, however, that the Plaintiff is judicially estopped from challenging any transfer from Tag to Seaboard LTS.  In addition, the Plaintiff has not cited any legal authority for the proposition that a preference action under section 547 can be premised upon an integration of multiple transactions.

Accordingly, the Motion to Dismiss is granted as to the November 2, 2015 Transfer sought to be avoided in Count Five of the Amended Complaint.  Because the November 18, 2015 Transfer and the November 20, 2015 Transfer occurred within the 90-day period prior to Seaboard LTS's petition date, Count Five will remain in part.

4.   **Dismissal Without Prejudice**

The Defendant argues that dismissal without leave to amend is appropriate because the Amended Complaint continues to suffer from the same deficiencies as the Complaint.  Dismissal with prejudice is proper when a plaintiff is given "adequate notice and opportunity to amend the deficiencies in its complaint and fail[s] to do so."  *See Document Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 34-35 (2d Cir. 2018).  Without an indication that the Plaintiff can plead additional facts that can cure the deficiencies, dismissal with prejudice is appropriate.  *See Tannerite Sports*, *LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 252 (2d Cir. 2017).

The Defendant argues that further amendment would be futile under the specific facts and circumstances of this case.  However, it is possible that the Plaintiff may be able to plead additional facts to cure the deficiencies present in the Amended Complaint.  Accordingly, dismissal is without prejudice to provide the Plaintiff with the opportunity to, if it can, file an amended complaint.

V.   **CONCLUSION**

For the reasons set forth above, it is hereby

**ORDERED:** Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012, the Defendant's Motion to Dismiss is **GRANTED** and Counts One, Two, Three, and Four of the Amended Complaint, and as to the November 2, 2015 Transfer in Count Five of the Amended Complaint, are dismissed; and it is further

**ORDERED:** The Plaintiff shall have until October 15, 2021, to file an amended complaint curing the deficiencies set forth herein.

Dated at Bridgeport, Connecticut this 16th day of September, 2021.

Julie A. Manning
Chief United States Bankruptcy Judge
District of Connecticut